The appeal in this case presents but one question for our decision, viz: whether the act of the legislature entitled "An act to provide for the completion of the *Page 120 
Erie Canal enlargement and the Genesee Valley and Black River canals," passed July 10, 1851 (chap, 485, of the laws of that year), is in conflict with the constitution?
The case was submitted while the argument was in progress in the case of George W. Newell, auditor, c. plaintiff in error, against The People ex. rel. Erastus R. Phelps, defendants in error, which involved the same question; with the understanding that the argument in that case should be regarded as applicable to this.
The case of Newell against the People also involved another question, entirely subordinate to the one mentioned; the decision of which becomes unnecessary, in consequence of the views entertained by a majority of this court upon the main question, and which dispose of both cases.
As I have not been able to agree with my brethren who have united in declaring unconstitutional the law referred to, it is proper, and due to myself, to state the reasons which have led me to dissent from them.
The complaint in this case in the supreme court was upon a promissory note given by the defendant, Munson, to J. Watson Williams, or order, for $515, dated January 23d 1852, payable on the first day of February next, thereafter, at the Bank of the State of New York, and endorsed and transferred by Williams to the plaintiff Rodman.
The answer admits the making, endorsement and transfer of the note, as stated in the complaint, but avers that the plaintiff became the purchaser and owner thereof on the 6th day of February, 1852, and after the same was due and payable. It then sets up as a bar to the action, that the note was executed and delivered to Williams in consideration of the sale and assignment by him to the defendant, of a canal revenue certificate for five hundred dollars, issued by the comptroller under and in pursuance of the second section of the act before referred to, and for no other consideration whatever; setting out the certificate particularly, and alleging that the act is unconstitutional, that it gave the comptroller no authority to issue the certificate, which was therefore null and void, and that the note was therefore *Page 121 
without any legal or valid consideration to support it: wherefore the plaintiff ought not to have or maintain his action against the defendant for the recovery thereof.
To this answer the plaintiff demurred, on the ground that the matters therein stated did not constitute a defence.
Judgment was given, at the special term, in favor of the defendant, on the demurrer, which was affirmed on appeal to the general term. From that judgment of affirmance by the general term, this appeal is brought
The judgment in the court below, holding the note upon which the action was brought to be void, was upon the ground that the act in question, by virtue of which the certificate which constituted the sole consideration of the note was issued, was in conflict with the constitution; that the certificate created no valid claim upon the state or any of its revenues, was without pecuniary value, and was therefore incapable of becoming by its sale or assignment to the defendant, a valid or sufficient consideration for a promise.
That is the question now to be considered.
The act is confessedly within the general scope of legislative power, and must be held valid and operative, unless shown to be an act of legislation which is forbidden, either in express terms, or by plain and obvious implication, by the organic law of the state. It is not pretended that the plan or scheme for the completion of the canals contemplated by the act in question, is in terms prohibited; so far from it, one of the arguments urged against the law is, that such a plan never entered the minds of the convention who formed the constitution, or of the people who adopted it. The objections to the law are of a character resting in argument and inference. The substance of them is, that it can not be carried into execution without transcending or overturning certain provisions of the constitution. Such objections, if they are sustained, should be, and are, as efficacious to defeat the law, at if it was in plain and express terms in contravention of the constitution.
It has, however, become a maxim, that a statute, the object and provisions of which are among the acknowledged powers *Page 122 
of legislation, is to be presumed valid and constitutional, unless the contrary is clearly demonstrated. A discussion of the question should therefore proceed upon such presumption; and the objector be regarded as holding the affirmative of the question, and required to make out a clear case, free from any rational doubt (Fletcher v. Peck, 6 Cranch, 87; ex parte M'Collum,
1 Cowen R., 564; Morris v. The People, 3 Denio, 381).
In Fletcher v. Peck, the question was whether a statute of the state of Georgia was in conflict with the constitution of that state — and Chief Justice Marshall remarks, that "the question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case." And again: "The opposition between the constitution and the law, should be such that the judge feels a clear and strong conviction of their incompatibility with each other."
In ex parte M'Collum, Chief Justice Savage says: "Before the court will deem it their duty to declare an act of the legislature unconstitutional, a case must be presented in which there can be no rational doubt." In the case of Morris v. ThePeople, Lott, senator, says: "The presumption is always in favor of the validity of the law, if the contrary is not clearly demonstrated." And in the opinion in this case in the supreme court, his honor, Justice Brown, correctly remarks that "for all the purposes of this argument the authority must be assumed in the first instance, because the legislative power extends over all the known and recognized subjects of municipal regulation, unless restrained by some positive rule of the fundamental law. Those, therefore, who put the legislative authority in controversy, take upon themselves the burthen of showing the limitation or prohibition."
In determining whether the law-making power has confined itself within its constitutional authority, there is this marked difference between the state legislature and the congress of the United States. The former is clothed with universal legislative power, excepting what is specifically withheld; while the latter possesses none but what is expressly granted, together with such as may become indispensable to their execution. An act of the *Page 123 
state legislature is to be presumed valid, while that of Congress is in the first place to be shown to be within the power granted. In the one case the power is inherent, and underived; in the other it is delegated and limited. The act of the state legislature is entitled to the benefit of every doubt, while that of Congress must be free from uncertainty or fluctuation of the mind, in reference to its constitutionality.
In the consideration of this case, therefore, I propose to examine the several objections to the constitutionality of the law in question, as they were presented upon the argument; and if any or either of them shall be found to be unanswerable, and such as to establish beyond a reasonable doubt that the statute in question and the constitution are incompatible with each other, the former must yield to the latter, and be declared void, whatever may be the consequences to the state or to individuals.
A variety of considerations conspire to admonish us against such a conclusion, productive as it must be of wide-spread and universal disaster, unless impelled thereto by the soundest logic and the clearest principles of interpretation.
1. The act in question was passed by a large majority of the people's representatives, upon a full and deliberate examination of the question of its constitutionality; and it has been ratified by a legislature subsequently elected by substantially the same people who chose the delegates constituting the convention which framed the constitution, and who afterwards approved and adopted it.
2. The executive of the state has given his sanction to the law, and the state officers have carried it into partial execution
3. A number of the most distinguished and able jurists and expounders of constitutional law have deliberately examined the question, without any supposable bias from professional employment, and have written opinions in favor of the validity of the law, which are clear and decided, and without the expression of a doubt.
4. Important rights, in a great multitude of cases, involving immense sums of money, have become vested under this law, *Page 124 
and through its means a million and a half dollars has found its way into the treasury of the state.
5. A large amount of the currency of the state is based upon the security of the canal revenue certificates, issued by the comptroller under the act, which is liable to be suddenly withdrawn from circulation, and thereby great confusion and derangement result to the pecuniary and commercial interests of the citizens. And, finally, a decision by this court, adverse to the validity of this law, will greatly delay a favorite and cherished object of the people of the state, upon the speedy accomplishment of which their prosperity greatly depends.
These considerations, either separately or collectively, I admit, are not controlling upon this court; yet it is not too much to say that they should lead us to the most profound circumspection, and induce us to require an exceedingly clear case before holding the law unconstitutional beyond a reasonable doubt.
The first objection to the validity of this law, is that it proposes to create a state debt in a manner not authorized by the constitution, but prohibited by that instrument. The objection is founded upon the 12th section of the seventh article, which is called the financial article of the constitution. That section provides that except the debts specified in the tenth and eleventh sections of the same article, no debt should be thereafter contracted by or on behalf of this state, unless in the manner specified in the said twelfth section. If the law under consideration depends for its authority upon the tenth, eleventh and twelfth sections, or any or either of them, no one will contend for its validity.
The question is, does it contemplate the creation of a state debt, in the proper and just sense of the term, and within the spirit of the twelfth section?
A debt, in its most general sense, is defined to be, that which is due from one person to another, whether money, goods or services; that which one person is bound to pay or perform to another; and it makes no difference, where the obligation is to pay money, whether it is payable out of, and limited to a specific fund, or whether the fund shall prove adequate or not, provided *Page 125 
it belongs to, and is under the control, as to the object to which it is to be applied, of the person who engages to make the payment. If the state has a particular revenue or fund over which the legislature has unlimited control and disposition, and contracts to pay out of that fund, or from the proceeds of that revenue, the payment would be the withdrawal of so much of the public money, by which taxation might become necessary to supply its place. The contract would be a burthen assumed by the state, and would be literally a state debt.
I regard it essential to the idea of a state debt, that, by possibility, its satisfaction may directly or indirectly involve taxation, or require the application of funds of which the state has the unlimited control and disposition. If the fund out of which the payment is to be made, and to which the obligation is limited, be so circumstanced, that it can not be otherwise applied, and is connected with a preexisting duty on the part of the state to make the application, the contract superadds no obligation or burthen, and therefore creates no debt.
The only indebtedness of the state which, as I understand, is by any one claimed to be created by the act, on the supposition of its validity, arises in favor of the holders of the "canal revenue certificates," issued under the second section. The same section declares that the certificates shall purport on their face to be issued by virtue of the act, and without any other liability, obligation or pledge, on the part of the state, than such as is contained in the act. These certificates are to be of the surplus revenues of the canals, which, by the third section of the seventh article of the constitution, are devoted to be applied to the completion of the Erie Canal enlargement and the Genesee Valley and Black River canals, until the said canals are completed. The second section of the act then prescribes the form of the certificates, in which it is expressly stated that the state incurs no obligation or liability, and is under no pledge, except such as is contained in the act. The third and fourth sections of the act show what are the pledge and the obligation or liability of the state, here referred to. It is the creation of a fund by consolidating or adding together *Page 126 
the surplus revenues before mentioned, from year to year, as each year's surplus shall be ascertained; which fund is to be applied to the payment of interest on the certificates as the same shall fall due, and to their redemption, as they shall become redeemable, or to the purchase of the certificates as provided in the fifth section: and such payment and purchases are to be made from such fund only.
Section fourteen provides against any claim upon the state under the certificates, in case of failure of revenues from the canals, by reason of pestilence, deficiency of crops, or breaches or damages to the canals, or from any other cause; and declares that the state shall in no event be liable to make up any deficiency of revenue or to redeem the certificates, in any other manner, than out of the canal revenues of the state, as before directed for such purpose, and that the certificates shall in no event or contingency be so construed as to create any debt or liability against the state or the people thereof, within the meaning of section twelve, article seven of the constitution.
It seems quite manifest that the legislature intended to guard this enactment against the objection under consideration; and if they have failed of their object, it must be because of the inadequacy of language to express such intention, or by reason of some inherent principle, or the object and provisions of the law, which render it repugnant to the twelfth section of said financial article. If there be any such principle, object, or provision, I confess I have not been able to discover either.
The principle is the anticipation and accumulation of such of the canal revenues as the constitution devotes to the object, which is declared by the same instrument to be the completion of the canals. The provisions, so far as I can discover, are in perfect harmony with such principle and object, so far, at least, as the question of state indebtedness is concerned. The question whether these revenues may be anticipated, or be allowed to accumulate, belongs to another branch of the argument, and will be considered in its proper place. The government is bound by the law of its organization to apply them to this object, and the same law has determined the legislature *Page 127 
to be the forum to decide and direct the manner of the application. The legislature, in the discharge of the duty thus enjoined, and in the exercise of the discretion thus conferred, have decided to garner up these revenues, from year to year, into a fund, and to offer to capitalists an investment of their money upon the credit of that fund alone with an express disavowal in advance, of any superadded liability of the state; and with the money thus invested, to accomplish the object in view, with all the expedition of which its magnitude would admit: so that if the completion of the canals was to be a benefit to the state or its citizens, the advantages expected to flow from it, might be enjoyed at the earliest possible limitation of time, instead of postponing them to a remote period, which must have been inevitable, in case of the expenditure in each year, of only one annual surplus or remainder of revenues.
In ascertaining what is meant by a state debt, in the sense of the 12th section of the 7th article, regard must be had to the 3d section, which imposes upon the legislature a binding obligation to apply the revenues in question to the completion of the canals. As to the question whether that duty shall be discharged, they have no discretion. They have no authority to apply the revenues to any other object; and they can not disregard the injunction, to cause the application to be made, without a criminal neglect of duty. If, in attempting to obey this requirement, they have confined all persons who furnish the means therefor, either in money, property, or services, to these revenues, for payment or remuneration, it seems to me beyond the power of sophistry to turn the transaction into a state debt.
In the execution of the act, a large number of creditors would be made; but in my judgment they would not be creditors of the state, or the state their debtor; certainly not in the sense of the restraining clause referred to. All obligations to them would arise upon the credit of the fund exclusively, beyond which they could have no claim upon any legal or equitable principle. All they would have a right to demand of the state *Page 128 
would be that the legislature should see that the fund was faithfully applied; and that duty or obligation of the state would spring, not out of the act, but the constitution itself. I do not recognize any difference in principle, as to what shall constitute an indebtedness, between the dealings or transactions of the state with individuals, and those of one individual with another. Whatever is a debt in one case, is also a debt in the other. The only difference between the two cases exists in the form and mode of the remedy or of obtaining satisfaction. It grows necessarily out of the fact that the state can not be sued by an individual. The state is sovereign, and, in theory, her power is supreme, and while, through her agents, she is supposed to enforce the performance of contracts, and redress injuries between individuals, according to established and known rules of law equity, she will, at the same time, do justice to individuals voluntarily in her own behalf, upon the same principles. This is what every citizen has a right to demand; and whatever may be rightfully demanded, may not be justly withheld. In the one case, the appeal to her power is by action, or some other legal process; in the other, by petition.
I know of no rule of jurisprudence or morals, nor of any theory of political economy, by which, in any given case, a man would have any superior or other claim upon the state, or by which the obligation of the latter would be greater or different than if the claim was upon an individual person. What would be due to the claimant must depend upon the intrinsic circumstances and merits of his case, and could not be measured by the nature or character of his adversary. In neither case should he receive more than he deserved, and that should be accorded to him in both.
The holders of the canal revenue certificates, and contractors under the act, are distinctly and repeatedly told, in the act, by the form and tenor of the certificates, and in the provisions of the contracts, that they are to look to the fund to be created by these remainders, and to no other source, for remuneration; and that the state is in no other event or contingency to be *Page 129 
liable beyond it; and the courts are forbidden to give any other construction to the act.
With what propriety or show of justice, then, it may be asked, could the state be required to make good any deficiency, should there happen to be one, in the revenues, for the purpose of satisfying these claims? Such a demand might with entire fairness be met with an answer to the following effect:
"We offered to receive your money, or to employ you to do the work, upon certain terms and conditions, and in view of an expected state of things in the future, which you as well as we confidently believed would be realized; all of which you understood as well as we did. We possessed no knowledge of facts which were not accessible to you, equally with us. No deception has been practiced upon you. You have acted with your eyes open, with a view to your own interest, and with no regard to ours. We have in good faith performed the contract on our part, and if it has proved an unprofitable enterprise to you, it is not our fault, but your misfortune."
If the legislature should make any allowance to the applicants in the case supposed, it would be done as a gratuity, and not in satisfaction of demands which could be enforced in a court of justice, provided the state could be impleaded there.
If these surplus revenues were under the control of the legislature in regard to the object of their application, as is the case in respect to many of the state revenues, the case would be entirely different. The certificates would then be a state debt, and the whole frame work of the bill would be a plain and palpable violation of the constitution.
There would, in that case, be an agreement to apply moneys when received, which belonged to the state, and under the control of the legislature, in liquidation of the certificates, without any preexisting obligation to do so, or to make any particular application of the fund.
That the existence or amount of the remainder are matters of uncertainty, would not render the transaction the less a state debt; because the whole scheme is founded upon the assumption that there will be remainders to some extent; otherwise the *Page 130 
whole structure is baseless and illusory. Whatever the amounts may happen to be, would belong generally to the state, and the agreement to apply them in the manner contemplated would be the assumption of a burthen, falling clearly within the definition of a debt, and which is forbidden by the constitution.
But suppose it be admitted that the plan for the completion of the canals which the act proposes, does fall under the denomination of a state debt, of what consequence is it, in view of the objection under consideration, provided it is a debt created not by the act but by the constitution? The only way a debt can be contracted by and on behalf of the state, is by the action of the legislature, in the enactment of a law for the purpose. Where is the burthen created or debt contracted by the act, which the constitution has not authorized and directed? None whatever has been, or can be shown. On the contrary, it is perfectly demonstrable that, by the act in question, no duty or burthen is assumed beyond what the constitution itself imposes, and which the legislature is not at liberty to decline. As well might a contract to pay for a job on the canals out of a single ascertained remainder, which had been received and in the treasury, be regarded a violation of the clause of the constitution restraining the state from contracting debts. There is not, to my mind, the shadow of a reason in support of the proposition embraced by the objection.
The next objection to the validity of the law, is that the constitution limits the application of the annual remainders of revenue to the time when the canals shall be completed, and that the act allows of and requires their application, until the nine millions of dollars, to be raised by the sale of the canal revenue certificates, and interest thereon, shall be paid out of the fund to be raised by the accumulation of such remainders; which, according to the plan and object of the act, would postpone the application far beyond the time when the canals would be completed.
This objection proceeds upon the ground that by the expression, "until the said canals shall be completed," is to be understood, the time when the canals are constructed and ready *Page 131 
for use. But I incline to think this interpretation is too limited and contracted. The verb, to complete, like many others, is used with some indefiniteness of signification; and the idea conveyed by it frequently depends upon the connection in which it is found, or the object to which it reefrs. The connection here, is where provision is made for the disposition of the remainders, and direction given for their application; and it is declared that they shall be applied until the canals shall be completed; that is, they shall be applied as long as the application shall be necessary to such completion, or, until the application is complete. This, in my judgment, was the sense in which the words in question were intended to be used. To attribute to the expression the meaning contended for, would, for aught I can perceive, defeat one of the purposes of the section of which they form a part. If the means dedicated to the construction of the canals can not be applied after the materials are furnished and the labor is performed, it follows that the work must be paid for in advance or go undone. If the application can be made one day after the canals are in the condition contemplated, it can be done twenty years after, so far as the constitutional provision in question is concerned.
If it were necessary, in order to vindicate the validity of the act, in view of the objection under consideration, I think it capable of demonstration that these remainders are applied to the completion of the canals long before their construction is finished. The act anticipates them, and makes the application before they accrue, to an amount equal to the aggregate of the certificates authorized to be sold, with the interest to accrue thereon. The constitution itself makes the application in reality, by setting them apart for the purpose declared.
To say that these revenues can not be applied to the completion of the canals, except by the act of paying out the money to contractors and agents, would be maintaining a view so narrow as to amount to a perversion of language, and defeat the object of the provision. The application is made, as far as the act makes it, in the creation of the fund provided for in the *Page 132 
third section of the act; or perhaps it would be more proper to say it takes place by virtue of the act, in regard to the several annual remainders, as soon as they are respectively ascertained; upon which they attach eo instanti to the fund, and the application then becomes complete and perfect.
The next objection relates to the application of the remainders to the payment of interest on the certificates. It is similar in character, and subordinate to the last, and if an answer has been furnished to that, it also disposes of this.
It will be proper in this connection to consider the question, whether the legislature, in obedience to the behests of the constitution, were at liberty to anticipate the future surplus revenues, with the view to the more expeditious accomplishment of the object to which they were devoted.
The only objection worthy of notice, which has been urged against it, arises out of the order of the words enjoining the duty. The requirement of the constitution is in the following language: "And the remainder of the revenues of the said canals, shall, in each fiscal year, be applied in such manner as the legislature shall direct, to the completion of the Erie Canal enlargement, and the Genesee Valley and Black River canals, until the said canals shall be completed." The argument of some of those who urge the objection is, that the times in which themoneys are to be expended are here fixed and determined; that the time for expending each remainder, is the same fiscal year in which it accrues, or is earned by the canals in operation. The fallacy of this view it seems to me is perfectly apparent. It consists in its utter impracticability. There never can be an ascertained remainder until after the close of the fiscal year; because, by the first and second sections, and the first part of the third section of the seventh article, large sums are to be first deducted and taken out of the net earnings of the canals, and applied to other objects, and what may be left is to constitute the remainder. The sections referred to evidently contemplate this process, once at least in each year, and it can not be done until after the year has expired, because the last hour of the year may increase or diminish the amount, and then, further *Page 133 
time is required to collect together the accounts and vouchers of receipts and expenses, from which to determine the net proceeds of the whole of the canal revenues for the year, before making the deductions required. Until then, there is in fact no remainder in existence upon which the constitution can act. And it is remainders which the constitution directs to be applied. A remainder is defined to be any thing which is left, after the separation or removal of a part — the quantity left, after subtraction or deduction. Obviously, therefore, there can exist no remainder until after the deduction is made, which can not take place in respect to the canal revenues, as already shown, until after the expiration of the fiscal year which produces it. Another class of objectors have contended that the expenditure of each remainder or annual surplus, must take place in the year in which it is ascertained, which must of course be the year next succeeding the one in which it accrues.
I can conceive no way in which this can be done unless the canal commissioners shall let out a portion of the work for a sum, which shall correspond exactly with the amount of the remainder — not a dollar of it can go to the next year's work, and not a dollar of the next year's revenue can be anticipated. The work contracted for, must be completed the same year, or be paid for in advance. If in consequence of any accident or unforseen event, the work is unfinished at the end of the year, the contractor must forever go unpaid; and this rule must be observed every year, until the canals are finished — and all this, notwithstanding any inconvenience or sacrifice of the public interests, or the injustice to individuals which may result. Can any one in his senses deliberately entertain the belief that the constitution requires or admits of a construction, involving such folly and absurdity?
These difficulties have been attempted to be met and answered. It has been said that the canal commissioners may enter into contracts for the work founded upon an estimated balance or remainder, in advance of the time when it shall be ascertained; and if it proves insufficient to meet the contracts, provision is made in the tenth section of the third article of *Page 134 
the constitution by which the deficiency may be supplied. That section authorizes the state to contract debts not to exceed a million of dollars at any one time, in order to meet casual deficits of revenues, or for expenses not provided for. Of course this argument can only be used by those who contend that the surpluses must be paid out in the same year in which they accrued, and before the remainder is ascertained.
Admitting the tenth section referred to authorizes the state to borrow money to provide for a deficiency in the estimated surplus, how does it answer the case of an unexpended balance? Suppose the contracts made the first of October (assuming the fiscal year to commence on that day), founded upon an estimate of what the remainder will amount to at the end of the year, and the event shows the remainder to be $500,000 more than the estimate, what shall be done with the excess? It can not go into the next year's operations, because that would be not only delaying the work contrary to the spirit of the constitution, but would produce accumulation, which is quite as objectionable, even in the mind of the objector, as anticipation. If $500,000, or $100,000, or any other portion of one year's remainder, may be added to that of the succeeding year, there is nothing in the constitution to prevent hoarding the entire remainders for ten or twenty years, before commencing the work of completing the canals.
But the conclusive reply is that there is no authority in the constitution for entering into contracts, founded on remainders which do not exist, and which, as has been shown, can not exist until the expiration of the year in which they accrue, and then there would be no necessity for it, because the amount would be ascertained. The tenth section referred to, is therefore totally inapplicable.
It has also been said, that contracts may be entered into, which may in their execution reach beyond the year in which they are made, and involve the expenditure of a larger amount than the ascertained remainder in the treasury, and pledging subsequent remainders for payment. But that would be anticipation in every sense of the term. *Page 135 
It must be nearly inevitable, it seems to me, that there would be balances on hand to a greater or less amount, or that there would be a deficiency, at the close of each year. It is possible that the whole ascertained remainder of a year would either with or without the fault of those charged with the administration of the fund, be in the treasury for years. What would in that case be done with the money? If applying, necessarily means expending or disbursing, and the constitution requires that to be done each year, I do not see but such unexpended remainder or balance, by a sort of non user, would escape from its destined object, and go into the general fund to be appropriated to any other purpose the legislature might direct.
The plan contained in the act of anticipating the remainders, obviates every difficulty which has been suggested. By it they are in each fiscal year applied to the completion of the canals, by becoming, in virtue both of the constitution and of the act, attached to the fund created for the same object the moment they came into existence. The object of the constitution is thus secured, and the manner of the application, which is left in express terms to the legislature, in no way conflicts with any of its provisions. That this plan was never thought of by the framers of the constitution, proves nothing against it. It certainly was not forbidden, and the legislature was at liberty to adopt it.
The constitution indicates no plan or manner of applying the surpluses, but leaves it entirely to the discretion of the legislature. It directs the time when they shall be applied, and that is all. That direction, as has been shown, has been complied with.
The next objection in order is, that as the act assumes to authorize the application of the remainders, exclusively to the payment of the certificates and the interest thereon, for a long period of time after the completion of the canals, and until the nine millions of dollars and interest are fully paid, it will, if effective, deprive the legislature of the power conferred by the third section of the seventh article of the constitution, to supply to the extent of $672,500 a year, any deficiency in the revenues *Page 136 
applicable to the necessary expenses of the government, from the surplus revenues of the canals; which under the constitution they may do, as soon as the general fund debt shall be paid, or the canals are completed.
To my mind there are several sufficient answers to this objection:
1. If by the first section of the act nothing is to be applied to the work of completing the canals, except what the constitution directs, then, surely, the difficulty which the objection anticipates, is imaginary. All the means contemplated for creating and continuing the fund, out of which the principal and interest of the certificates are to be paid, are those specified in the first section. That section is a mere echo of the constitution, and must of course be limited in its effect by a just and sound interpretation of the constitution.
2. The third section of the seventh article of that instrument, permits the legislature, in a certain contingency, after a certain period, in its discretion, to divert, for a time, a portion of the revenues previously and in the same section set apart for completing the canals, to the purpose of supplying a possible deficiency in the revenues of the state for defraying the necessary expenses of the government; and that after the general fund debt shall be paid, or the canals shall be completed, then the sum of $672,500, or so much thereof as shall be necessary, may be annually appropriated to defray the expenses of the government. It is to be remarked, that all these provisions in relation to the future action of the legislature are entirely permissive. There is no direction or requirement — all is left to its discretion. When the time arrives that the legislature shall be at liberty to exercise the discretion conferred, it is to be assumed that they will act discreetly and justly, in view of the condition of the state and its finances, and with a proper regard to the just claims of individuals; and that if they shall then choose to exercise the power in question in thus diverting the revenues, notwithstanding the provisions of this act, they will have the power to do so. This is one of the risks which is necessarily incurred by the holders of the certificates, and by all persons *Page 137 
advancing money, or rendering services upon the credit of the fund provided for. Such risk is what every person who deals with the state is obliged to run. From the nature of the case, there can never be any other guaranty on the part of the state than its own good faith.
While it can not be maintained as a general proposition, that one legislature can absolutely bind their successors, it is equally true that they may give pledges and assurances, in relation to the future action of those who come after them in power. The pledge, for good reasons, may not be fulfilled, or it may be repudiated, and the state disgraced; but this is never to be presumed, any more than if the state should borrow money on the faith of a law, directing a tax for its repayment, that a subsequent legislature would repeal the law, or refuse or neglect to levy the tax. And if the law under consideration contains a pledge, that no future legislature will make the diversion referred to of the revenues, it should be taken for granted, that the pledge will in good faith be observed. If no such assurance can be implied, it forms no part of the contract, its fulfillment can never with propriety be urged, and the objection falls to the ground.
It is furthermore objected that the act assumes to appropriate the canal remainders for more than two years, and without undertaking to specify any sum as the amount appropriated, contrary to the provisions of the 8th section of article seven of the constitution.
The said 8th section declares that no money shall be paid out of the treasury of this state, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within two years next after the passage of such appropriation act; and that every such law, making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied, c.
The thing here forbidden is the payment of money out of the treasury, c., after two years from the passage of an appropriation act, specifying the sum appropriated, and the object to which it is to be applied. *Page 138 
I have examined the act in vain to find any direction or provision for the payment of any money whatever for any purpose except what is contained in the 8th and 9th sections; and there is certainly nothing in those sections in conflict with the provision of the constitution above referred to; but, on the contrary, they are in strict conformity with it.
The 8th section of the act appropriates $3,500,000, to be paid out of the avails of the sales of certificates, c., to be applied to the completion of the canals during the year next after the passage of the act, and the like sum from the same source, for like object, during the second year next after the passage of the act. And the 9th section appropriates $180,000 for the payment of the first year's interest on the canal revenue certificates, and the sum of $360,000 for the payment of the second year's interest on the certificates, out of the same avails, c. I can discover no other appropriations in the act; all its provisions which assume to dispose of the remainders, for a longer period than two years, amount to nothing more than a pledge or assurance for a faithful administration of the fund and can not be effectuated without further legislation. No future legislature could refuse or neglect to make the necessary appropriations to redeem the pledge, without proving recreant to their high duties, their oaths and their consciences; a supposition which is not to be admitted.
It is also objected that the act violates that clause of the constitution which declares that "the legislature shall not sell, lease or otherwise dispose of any of the canals of the state; but they shall remain the property of the state, and under its management forever" (art. vii, § 6).
Assuming that a sale of the revenues for a series of years to come, would be regarded a partial sale of the canals, it must be shown, in order to give force to the objection, that the transaction amounts to a sale. I, for one, do not think it does; and it was urged as I think with entire success, by one of the counsel who argued against the validity of the law, that it lacked several essential ingredients of a sale. But, however this may be, whether it amounts to a sale or not, if the act does *Page 139 
just what the constitution says shall be done with the surplus revenues in question, and nothing more, as I have attempted to show, it is absurd to say the constitution is thereby violated. The fallacy of the objection is too apparent for discussion, or to entitle it to further notice.
It is likewise contended that the sixth section of the act, which requires the canal revenue certificates to be received as the basis of banking is repugnant to the 6th section of the 8th article of the constitution, which requires ample security for the redemption in specie of notes issued or put in circulation as money. The section reads as follows: — "The legislature shall provide by law for the registry of all bills or notes issued or put in circulation as money, and shall require ample security for the redemption of the same in specie."
A sufficient and conclusive answer to this objection is, that the legislature are the exclusive judges of the sufficiency of the security to be taken, and it is not for the courts to call in question their judgment. If they deem these certificates ample security for the redemption in specie of circulating notes, their decision is final and can not be inquired into.
I have now gone through with a consideration of all the objections, which counsel have thought worthy of being presented, to the constitutionality of the act in question. My own mind is not perplexed with the slightest doubt in regard to either of them. I have attempted to meet them fairly and candidly, and have shown, as it seems to me, that they are separately and collectively entirely untenable.
In the conclusion to which I have arrived, I regret to find myself standing alone among the members of the court of dernier resort, who take part in the decision.
This circumstance, perhaps, should lead to a distrust of my own judgment, even if it fails to shake my confidence in the correctness of the views I have expressed. However this may be, I yield to the decision, if not willingly, yet respectfully.
WATSON, J. — Did not hear the argument.
GRIDLEY, J. — Was not present at the decision.
Judgment reversed and mandamus denied. *Page 140 
[EDITORS' NOTE: THIS PAGE IS BLANK.] *Page 141